# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

H. LEE MOFFITT CANCER CENTER AND
RESEARCH INSTITUTE HOSPITAL, INC.,

        *Plaintiff,*

   v.

ALEX M. AZAR II, Secretary, United States
Department of Health and Human Services,

        *Defendant*.

Civil Action No. 16-2337 (TJK)

## <u>MEMORANDUM OPINION</u>

Defendant Alex M. Azar II, sued here in his official capacity as head of the Department of Health and Human Services (and referred to as "HHS"), oversees Medicare, a government health insurance program for the elderly and disabled. The Outpatient Prospective Payment System ("OPPS") is a component of Medicare that deals with payments to hospitals for outpatient treatment services. This agency-review case concerns a statutory amendment to OPPS made in 2010 by the Patient Protection and Affordable Care Act (the "ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010). Under the amendment, HHS was required to study certain costs incurred by a small group of hospitals that focus on cancer research and treatment (commonly referred to as the "cancer hospitals"). If HHS determined that the cancer hospitals' costs were higher than other hospitals', it was required to make an "appropriate adjustment" to payments to the cancer hospitals "effective for services furnished on or after January 1, 2011." HHS ultimately did find that the cancer hospitals' costs were higher and warranted an increase in OPPS payments to them. But HHS did not issue a final regulation containing the cancer-hospital adjustment until well into 2011, and made the adjustment effective only as of January 1, 2012.

Plaintiff H. Lee Moffitt Cancer Center and Research Institute Hospital, Inc. ("Moffitt") is a cancer hospital. It has challenged HHS's failure to make higher OPPS payments to cancer hospitals for 2011, claiming HHS thereby violated its statutory mandate. HHS defends its actions as reasonable, and also argues that the adjustment it made is not subject to judicial review. Each party has moved for summary judgment. ECF No. 13; ECF No. 16; *see also* ECF No. 13-1 ("Pl.'s Br."); ECF No. 16-1 ("Def.'s Br."); ECF No. 19 ("Pl.'s Reply"); ECF No. 21 ("Def.'s Reply"). As explained below, the Court agrees with Moffitt that HHS failed to comply with the statute's directive to make an adjustment effective for services furnished during the 2011 calendar year. Therefore, the Court will enter summary judgment for Moffitt and remand the case to HHS so that it can consider and make an "appropriate adjustment."

## I. Legislative and Regulatory Background

### A. Medicare and OPPS

Medicare, created in 1965, is a health insurance program run by the federal government for the elderly and disabled. *See Univ. of Tex. M.D. Anderson Cancer Ctr. v. Sebelius* ("*M.D. Anderson*"), 650 F.3d 685, 686 (D.C. Cir. 2011); *Amgen, Inc. v. Smith*, 357 F.3d 103, 105 (D.C. Cir. 2004). Funding the program "has posed a massive challenge for the U.S. Government, as the costs of Medicare have grown significantly over time." *M.D. Anderson*, 650 F.3d at 686. Therefore, Congress has tried various measures to "rein in" those costs over time. *Id.*

In 1997, Congress made a major change to Medicare intended to reduce the cost of outpatient services. Up to that point, "hospitals treated outpatients, and then informed Medicare of the cost of the treatment, and then received money to cover costs that were 'reasonable.' Not surprisingly, costs exploded under this system because there was little check on the services and costs for which hospitals received reimbursement." *Id.* at 688. The Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251, replaced that system of cost-based payments with

OPPS, which requires "payments for outpatient hospital care to be made based on predetermined rates." *Amgen*, 357 F.3d at 106.

The statutory provision governing OPPS, codified at 42 U.S.C. § 1395*l*(t), imposes a number of different requirements with which HHS must comply in setting prospective rates for outpatient services. Subsection (t)(2)(E) also provides HHS a broad discretionary authority to make "adjustments" to those rates:

> [T]he Secretary shall establish, in a budget neutral manner, outlier adjustments under paragraph (5) and transitional pass-through payments under paragraph (6) and other adjustments as determined to be necessary to ensure equitable payments, such as adjustments for certain classes of hospitals[.]

42 U.S.C. § 1395*l*(t)(2)(E). Because adjustments under § (t)(2)(E) are required to be "budget neutral," HHS must offset any increased payments to some hospitals with reduced payments to others. *See Amgen*, 357 F.3d at 112. HHS must review these adjustments at least annually. *See* 42 U.S.C. § 1395*l*(t)(9)(A).

At the time OPPS was enacted, "some hospitals would receive significantly less money" under OPPS than under the old system. *M.D. Anderson*, 650 F.3d at 689. To soften the blow, Congress provided transitional outpatient payments ("TOPs") to hospitals during OPPS's first few years. *See* 42 U.S.C. § 1395*l*(t)(7); *M.D. Anderson*, 650 F.3d at 689. Congress made special provision for the cancer hospitals, which consist of eleven hospitals (including Moffitt). *See* 42 U.S.C. § 1395ww(d)(1)(B)(v); ECF No. 1 ("Compl.") ¶ 21; Def.'s Br. at 5. For cancer hospitals, TOPs remained available permanently. *See* 42 U.S.C. § 1395*l*(t)(7)(D)(ii). These payments effectively guarantee that cancer hospitals will be reimbursed for their costs to the same extent as under the old, pre-1997 system. *See M.D. Anderson*, 650 F.3d at 689. Moreover, unlike adjustments under § (t)(2)(E), TOPs are not required to be budget neutral. *See* 42 U.S.C. § 1395*l*(t)(7)(I).

**B.     ACA Section 3138 and HHS's Regulations**

In Section 3138 of the ACA, enacted in March 2010, Congress added another special provision for cancer hospitals to the OPPS statute. The provision ordered HHS to undertake a study of whether cancer hospitals' costs for delivering outpatient services exceeded other hospitals' costs. *See* 42 U.S.C. § 1395*l*(t)(18)(A). "Insofar as" HHS made such a determination, it was to "provide for an appropriate adjustment under paragraph (2)(E) to reflect those higher costs effective for services furnished on or after January 1, 2011." *Id.* § 1395*l*(t)(18)(B).

HHS first addressed this requirement in an August 2010 proposed rulemaking regarding OPPS payment rates for 2011. Medicare Program; Proposed Changes to Hospital Outpatient Prospective Payment System and CY 2011 Payment Rates, 75 Fed. Reg. 46,170 (proposed rule Aug. 3, 2010). The agency explained its study of the cancer hospitals' costs, which showed that the cancer hospitals did in fact have significantly higher costs. *See id.* at 46,233-34. HHS then discussed its approach to crafting an adjustment to reflect those costs. *Id.* at 46,235-37. It explained that it had not considered TOPs in crafting the proposed adjustment. *Id.* at 46,235. Its reasons were two-fold: First, the proposed adjustment had to be made under § (t)(2)(E) and thus had to be budget neutral; therefore, the agency believed it was "appropriate to assess costliness and payments within the budget neutral payment system," which does not include TOPs. *Id.* Second, TOPs are paid on an aggregate basis, and thus could not could not be weighted on a per-service basis, as the proposed adjustment would be. *See id.*

Based on its analysis, HHS proposed "a hospital-specific payment adjustment" designed "to raise each cancer hospital's PCR ['payment to cost ratio'] to the weighted average PCR for all other hospitals." *Id.* Overall, this would increase cancer hospitals' OPPS payments by 41.2%, and in order to be "budget neutral," OPPS payments to other hospitals would have to be 0.66% lower. *See id.* at 46,225, 46,236. Cancer hospitals would still receive retroactive TOPs if

their cost recovery fell below pre-1997 levels; however, because the up-front OPPS payments would be higher, HHS estimated that only one cancer hospital would continue to receive TOPs if the proposal went into effect. *See id.* at 46,237.

After issuing the proposed rule, HHS received several comments criticizing its approach. *See* Medicare Program: Hospital Outpatient Prospective Payment System and CY 2011 Payment Rates, 75 Fed. Reg. 71,800, 71,886-87 (Nov. 24, 2010) (summarizing comments). In particular, many commenters argued that HHS's approach was inequitable: cancer hospitals would receive only a small net benefit (because most of the increases to their up-front OPPS payments would be offset by lower TOPs down the line), while other hospitals would receive a larger net loss (because every dollar spent on higher OPPS payments to the cancer hospitals had to be neutralized by lower OPPS payments to other hospitals). *See* JA at 30-31, 33-34, 39-40, 43, 63-64, 67, 73-74, 77-80, 82-83, 86-87, 90, 92-93, 95-96, 98-100.[1] These commenters argued such an adjustment would not be budget neutral when taking TOPs into account, but would instead result in reduced overall spending. *See, e.g.*, JA at 31. Some commenters also argued that the way HHS proposed to implement the adjustment could lead to higher co-payments for Medicare beneficiaries. JA at 45-46, 83, 87, 96-97, 101. Yet another commenter urged a delay in implementing the regulation. *See* JA at 70.

Even the cancer hospitals themselves—while requesting a more generous net adjustment—agreed with some of these criticisms. *See* JA at 57-60. They argued that HHS

---

[1] The parties filed a Joint Appendix ("JA"), ECF No. 22, that contains relevant excerpts from both the administrative record relating to Moffitt's claim for reimbursement and the record relating to HHS's rulemakings. Given the different page numbering systems used in the administrative and rulemaking records, the Court will cite the JA using the page numbers generated by ECF.

could use its "exceedingly broad" equitable authority under § (t)(2)(E) to structure the adjustment so as to avoid harming Medicare beneficiaries and other hospitals. JA at 59.

One commenter also took aim at HHS's cost study. It argued that no adjustment was appropriate, because cancer hospitals and other hospitals had comparable cost-recovery ratios when TOPs were considered. *See* JA at 40. That same commenter also described HHS's cost analysis as "flawed," arguing that it had failed to control for many factors, and that the perceived cost difference could be due to inefficiency on the part of the cancer hospitals. *See* JA 38-39.

In the face of these comments, HHS punted. In its final rule regarding OPPS payments for 2011, HHS acknowledged the "broad range of very important issues and concerns" that commenters had raised. 75 Fed. Reg. at 71,887. It therefore determined to undertake "further study and deliberation" on the cancer-hospital adjustment, which would "take a longer period of time than is permitted in order for us to meet the publication deadline of this final rule with comment period." *Id.*

HHS revisited the issue in its proposed rulemaking for 2012 OPPS payment rates. Medicare and Medicaid Programs: Hospital Outpatient Prospective Payment, 76 Fed. Reg. 42,170 (proposed rule July 18, 2011). Despite the comments it had received, HHS proposed essentially the same approach as before: upward adjustments to prospective OPPS payments for cancer hospitals based on each hospital's costs, representing a net increase of 39% across all eleven. *See id.* at 42,220-21. HHS estimated that, as a result of that increase, no cancer hospitals would receive TOPs. *Id.* at 42,221. To accommodate these increases, HHS once again proposed a reduction in other hospitals' payments (this time by 0.73%). *See id.* at 42,210. Commenters again criticized this approach, largely along the same lines as before. *See* JA at 109-12, 119-21, 127-29, 132, 170-71, 173-74, 187-89.

The cancer hospitals, while continuing to urge an even greater increase, yet again asked HHS to exercise its "exceedingly broad" authority to mitigate negative effects on others. JA at 153-54 & n.34; *see* JA at 147-57. The cancer hospitals also argued Section 3138 of the ACA compelled HHS to make any adjustments apply retroactively to services furnished since January 1, 2011. *See* JA at 157.

In November 2011, HHS finalized the proposed adjustment, but substantially altered its approach. *See* Medicare and Medicaid Programs: Hospital Outpatient Prospective Payment, 76 Fed. Reg. 74,122, 74,203-07 (Nov. 30, 2011). HHS yielded to comments urging it to consider the net gain to cancer hospitals (that is, both the increased prospective OPPS payments and the resulting decreases in TOPs) in calculating the offsetting decrease in OPPS payments to other hospitals. *See id.* at 74,204. When taking TOPs into account, the resulting increase to payments for cancer hospitals was 9.5% overall (the exact amount varying for each individual cancer hospital). *Id.* at 74,206. The offsetting decrease for other hospitals was only 0.22%, much smaller than the 0.73% in the proposed rule. *See id.* at 74,190, 74,204. In order to avoid increased copayments for Medicare beneficiaries, HHS also determined not to increase the rates for services furnished by cancer hospitals prospectively, but instead to make aggregate payments later, during the "cost report settlement" process. *See id.* at 74,204.

Significantly for purposes of this lawsuit, HHS rejected the cancer hospitals' suggestion that it extend the payments retroactively to cover services furnished in 2011. *Id.* at 74,205. It provided several justifications for that decision. First, it argued that its need to consider comments had reasonably delayed its final adoption of the adjustment. *Id.* HHS also took the position that its obligation to provide an adjustment was not triggered until it had made a final determination about cancer hospitals' costs, and that it had not finalized its study until the

November 2011 rule.  *Id.*  Finally, HHS referenced the statute's budget-neutrality requirement, noting that it had not reduced payments to other hospitals in 2011 to account for an increase for the 2011 calendar year.  *See id.*

## C.    Moffitt's Challenge

Moffitt's fiscal year ends on June 30.  *See* Compl. ¶ 30.  Therefore, HHS's determination not to make a cancer-hospital adjustment for the 2011 calendar year affected Moffitt's 2011 and 2012 fiscal years.  *See id.*  Moffitt received notices of program reimbursement for those fiscal years in September 2012 and September 2013, respectively.  JA at 17, 22.  Moffitt appealed those notices to the Provider Reimbursement Review Board.  JA at 16, 21.  It argued, among other things, that HHS had improperly refused to apply the cancer-hospital adjustment to the 2011 calendar year.  JA at 13-15, 18-20.  The Review Board concluded that Moffitt's appeals were timely, but that it lacked authority to resolve the legal issue of Moffitt's entitlement to a retroactive adjustment under Section 3138 of the ACA.  JA at 5.  The Board granted expedited judicial review of that question.  *Id.*  In November 2016, Moffitt filed this action against HHS seeking review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*  Compl. ¶ 11.  It seeks an order declaring HHS's final rule invalid insofar as it delayed the effective date of the adjustment to January 1, 2012, and directing HHS to pay Moffitt an appropriate retroactive adjustment (estimated to be $7.4 million) plus interest.  *See id.* ¶¶ 6, 41.  The parties then filed the instant motions for summary judgment.  ECF Nos. 13, 16.

## II.    Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083

(D.C. Cir. 2001). "The 'entire case' on review is a question of law." *Id.* "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Alston v. Lew*, 950 F. Supp. 2d 140, 143 (D.D.C. 2013). "Under the Administrative Procedure Act, a court may set aside an agency's final decision only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ams. for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C. Cir. 2013) (quoting 5 U.S.C. § 706(2)(A)).

Courts often analyze agency interpretations of statutes "under the familiar two-step framework of *Chevron*." *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018) (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). "If the Court determines that 'Congress has directly spoken to the precise question at issue,' and 'the intent of Congress is clear, that is the end of the matter.'" *Id.* (quoting *Chevron*, 467 U.S. at 842). "If, however, 'the statute is silent or ambiguous with respect to the specific issue,' then the Court must determine 'whether the agency's answer is based on a permissible construction of the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 843). "[A]gencies only 'possess whatever degree of discretion [an] ambiguity allows.'" *Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 224 (D.C. Cir. 2018) (second alteration in original) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013)).

"[U]nder *Chevron*, [courts] owe an agency's interpretation of the law no deference unless, after 'employing traditional tools of statutory construction,' [they] find [themselves] unable to discern Congress's meaning." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (quoting *Chevron*, 467 U.S. at 843 n.9). That is, courts "examine the [statute's] text, structure, purpose, and legislative history to determine if the Congress has expressed its intent

unambiguously." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 605 (D.C. Cir. 2016) (per curiam), *cert. denied*, 137 S. Ct. 2296 (2017). While "[t]he starting point for [courts'] interpretation of a statute is always its language," *Lindeen v. SEC*, 825 F.3d 646, 653 (D.C. Cir. 2016) (first alteration in original) (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989)), the court may not stop after reading one textual provision in isolation. "[I]n interpreting a statute, a court 'must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (quoting *Kelly v. Robinson*, 479 U.S. 36, 43 (1986)).

In addition, courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Thus, district courts must dismiss any claim over which they lack subject matter jurisdiction, regardless of when the challenge to subject matter jurisdiction arises. *See* Fed. R. Civ. P. 12(h)(3).

## III.  Analysis

The parties' dispute concerns the following text, which the ACA added to the Medicare statute:

> Insofar as the Secretary determines under [the study required by] subparagraph (A) that costs incurred by [cancer hospitals] exceed those costs incurred by other hospitals furnishing services under this subsection, the Secretary shall provide for an appropriate adjustment under paragraph [42 U.S.C. § 1395*l*(t)](2)(E) to reflect those higher costs *effective for services furnished on or after January 1, 2011.*

ACA § 3138, 124 Stat. at 439 (codified as amended at 42 U.S.C. § 1395*l*(t)(18)(B)) (emphasis added).[2] In Moffitt's view, the phrase "effective for services furnished on or after January 1, 2011," means that HHS, regardless of when it actually made the adjustment for the cancer hospitals, was required to make it apply to services furnished in 2011—even if that meant applying it retroactively. Pl.'s Br. at 21; Pl.'s Reply at 9-10. HHS argues that Congress selected the effective date on the implicit assumption that HHS would complete its study by January 1, 2011, that the statute is silent about what should happen if HHS only acted after that date, and that HHS has reasonably interpreted the statute not to require a retroactive effective date. Def.'s Br. at 13. HHS also argues that the Court lacks jurisdiction to hear Moffitt's challenge, because it made an adjustment under § (t)(2)(E), and Congress has precluded lawsuits challenging those adjustments. *Id.* at 14-17. The Court agrees with Moffitt's interpretation of the statute, and will order HHS to provide for an appropriate adjustment for the 2011 calendar year.

A.    **HHS's Jurisdictional Challenge**

The Court must begin by determining whether this case falls within the jurisdictional bar in the OPPS statute. In *Amgen, Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004), the D.C. Circuit held that courts generally lack jurisdiction to review equitable adjustments made under § (t)(2)(E). *See id.* at 111-12. Congress exempted the "development of the classification system under [§ (t)(2)]," including "other adjustments" made under § (t)(2)(E), from "administrative or judicial review." 42 U.S.C. § 1395*l*(t)(12)(A). It did so because "piecemeal review of individual payment determinations could frustrate the efficient operation of the complex prospective payment system." *Amgen*, 357 F.3d at 112. As the D.C. Circuit explained, judicial meddling in

---

[2] This language was subsequently amended by Section 16002(b) of the 21st Century Cures Act, Pub. L. No. 114-255, 130 Stat. 1033, 1326 (2016), in a way that is immaterial to this case.

the payment system years after the fact would also be inconsistent with the inherently prospective nature of the system. *Id.* Retroactively increasing payments to some hospitals would "requir[e] offsets elsewhere" and "interfere with [HHS's] ability to ensure budget neutrality in each fiscal year." *Id.* Thus, challenges to "the reasonableness or procedural propriety" of individual adjustments are precluded. *Id.* at 113. However, the D.C. Circuit further explained, because of the presumption favoring judicial review of *ultra vires* agency action, the jurisdictional bar does not preclude review of adjustments under § (t)(2)(E) to the extent that they "exceed[] agency authority." *Id.* at 112. Such *ultra vires* review "is quite narrow." *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014). It generally extends only to "'[f]acial' violations of statutes," which "are infrequent and typically raise issues—unrelated to the facts of the particular cases—that need only be resolved by the courts once." *Dart v. United States*, 848 F.2d 217, 222 (D.C. Cir. 1988).

The Court concludes that it has jurisdiction to hear Moffitt's claim that HHS was required to, but did not, make an adjustment for the cancer hospitals for 2011. Section 3138 of the ACA, codified in § (t)(18), required HHS (1) to study the cancer hospitals' costs, and (2) if the study revealed higher costs, to make an "appropriate adjustment" pursuant to § (t)(2)(E) effective for the 2011 calendar year. ACA § 3138, 124 Stat. at 439. Moffitt alleges that HHS erred by refusing to comply with the second mandate: having found that the cancer hospitals had higher costs, HHS was required to make "*an* appropriate adjustment" effective for the 2011 calendar year, but instead it denied the cancer hospitals' request for such an adjustment. Compl. ¶¶ 37, 40 (emphasis added). The jurisdictional bar in the OPPS statute applies to adjustments *actually made* under § (t)(2)(E). *See Amgen*, 357 F.3d at 112-13. Especially given that the bar must be narrowly construed, *see id.*, the Court sees no reason why it should prevent judicial review under

the APA of a failure to make an adjustment that, in Moffitt's view, Congress specifically mandated in another part of the statute. Moreover, even under *ultra vires* review, the Court would still have jurisdiction to hear this claim because it alleges that HHS committed a facial violation of the statute, not merely that HHS acted unreasonably. *See id.* Thus, HHS's decision not to make *any* adjustment for the 2011 calendar year is subject to judicial review.[3]

The Court lacks jurisdiction, however, to entertain Moffitt's case to the extent it seeks to change the effective date of the adjustment HHS did in fact make for the 2012 calendar year. *See* Compl. ¶¶ 36, 41(a)-(c). The statutory bar was plainly triggered once HHS made the 2012 adjustment for the cancer hospitals "under paragraph [(t)](2)(E)." ACA § 3138, 124 Stat. at 439; *see* 76 Fed. Reg. at 74,199-207. Section (t)(2)(E) allows for three kinds of adjustments: "outlier adjustments" under § (t)(5), "transitional pass-through payments" under § (t)(6), and "other adjustments as determined to be necessary to ensure equitable payments, such as adjustments for certain classes of hospitals." 42 U.S.C. § 1395*l*(t)(2)(E). The adjustment mandated by Section 3138 can only be one of these "other adjustments," which Congress has exempted from judicial review. *See Amgen*, 357 F.3d at 111-13.

Thus, to the extent that Moffitt seeks to challenge the effective date of the adjustment that HHS made for the 2012 calendar year—as opposed to HHS's refusal to make *any* adjustment for the 2011 calendar year—this Court has jurisdiction only to the extent that the adjustment HHS made "exceed[ed] agency authority." *Id.* at 112. And the adjustment did not do so.

---

[3] HHS argues that this decision does in fact fall within the bar, because "a decision *not* to make an adjustment" is equivalent to "a decision to make an adjustment of zero." Def.'s Reply at 4. The Court disagrees. There is a difference between deciding, after considering the issue, that the amount of an "appropriate adjustment" is zero and refusing even to consider what an "appropriate adjustment" might be. In the November 2011 rulemaking, HHS chose the latter path, explaining that it had "decided not to" make an adjustment for the 2011 calendar year without considering the amount of such an adjustment. 76 Fed. Reg. at 74,205.

Neither party disputes that HHS had authority to make a cancer-hospital adjustment for the 2012 calendar year, so it did not exceed its authority merely by making the adjustment. In fact, independently of Section 3138 of the ACA, HHS could have made such an adjustment under § (t)(2)(E) alone. Instead, Moffitt effectively argues that HHS exceeded its authority by failing to act in a way it was legally required to—in this case, by declining to make the adjustment for 2012 apply retroactively to 2011 as well. *See* Compl. ¶¶ 36, 41(a)-(c). Doing so would have provided Moffitt the same adjustment for both 2011 and 2012. But HHS was not *required* to apply the *same* adjustment in both calendar years, such that it exceeded its authority by not doing so. To the contrary, the OPPS statute envisions that adjustments under § (t)(2)(E) could vary from year to year: it requires HHS to "review not less often than annually and revise the . . . other adjustments described in paragraph [(t)](2) to take into account" several considerations, including "new cost data" and any "other relevant information and factors." 42 U.S.C. § 1395*l*(t)(9)(A). Moreover, as Moffitt and the other cancer hospitals argued in their rulemaking comments, HHS's statutory authority to craft an appropriate and equitable adjustment is "exceedingly broad." JA at 59, 153. Thus, HHS cannot be said to have exceeded its authority merely by declining to make the 2012 adjustment apply retroactively to 2011.

Therefore, the Court has jurisdiction to hear Moffitt's case to the extent it challenges HHS's decision not to apply *any* adjustment for the 2011 calendar year, but not to the extent Moffitt challenges the effective date of the adjustment that was in fact promulgated for the 2012 calendar year.

### B. Whether HHS Failed to Comply with Section 3138 of the ACA

The Court agrees with Moffitt that HHS improperly refused to make a cancer-hospital adjustment for the 2011 calendar year as required by Section 3138 of the ACA. While the parties dispute exactly when HHS completed its study determining that the cancer hospitals had

14

higher costs, they agree that HHS made such a determination. *See* Def.'s Br. at 18-19; Pl.'s Reply at 22-27. In fact, HHS's study used cost data from 2009 to model the cancer hospitals' costs for 2011, concluding that those costs would be higher *in 2011*. *See* 76 Fed. Reg. at 74,200-01. Thus, HHS was required to "provide for an appropriate adjustment under paragraph (2)(E) to reflect those higher costs effective for services furnished on or after January 1, 2011." ACA § 3138, 124 Stat. at 439. HHS declined to do so. *See* 76 Fed. Reg. at 74,205. Instead, HHS did something slightly different: it made an adjustment effective for services furnished on or after January 1, 2012, without any adjustment for the 2011 calendar year. *Id.* But the statute plainly requires an adjustment for the 2011 calendar year as well.

HHS offers an alternative reading of the statute. It argues that Congress included the effective date on the implicit assumption that HHS would make the adjustment by January 1, 2011, and was silent about what would happen if HHS failed to act by that date. *See* Def.'s Br. at 13; Def.'s Reply at 5-6. Therefore, HHS argues, it is entitled to *Chevron* deference regarding what the effective date of the adjustment should be. *See* Def.'s Br. at 21-23.

The Court finds this interpretation untenable. It has no basis whatsoever in the text of Section 3138, which plainly commands that HHS make an adjustment "effective for services furnished on or after January 1, 2011." Nothing in the text suggests that the effective date of the adjustment was subject to a condition precedent about the timing of HHS's action. In addition, the relatively close timing between the date of the ACA's enactment and this effective date undercuts HHS's interpretation. In March 2010, Congress unambiguously required HHS to implement an adjustment effective for services furnished on or after January 1, 2011. It could hardly have been inconceivable to Congress that HHS might not both complete the required study and make an appropriate adjustment in the nine months that remained in 2010. Finally,

this interpretation runs afoul of the principle that, when Congress uses the word "shall," its language is usually more than precatory. *See United States v. Monzel*, 641 F.3d 528, 531-32 (D.C. Cir. 2011). Under HHS's proffered interpretation, the effective date in the statute has little practical meaning: the agency has to abide by the effective date, unless it chooses to wriggle out of the effective date by its own delay—at which point it gets to choose another effective date. Not so. Here, Congress spoke "in plain terms" in order "to circumscribe," not "to enlarge, agency discretion." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). Congress was not, when it wrote a mandatory effective date into the statute, really authorizing HHS to pick its own.

HHS's "silence" argument might hold water if the statute actually contained a deadline that required HHS to act in advance of the effective date. In that case, the text of the statute would both raise and fail to answer an obvious question: what should the effective date be if HHS failed to act in a timely manner? HHS occasionally flirts with the idea that the effective date could in fact be interpreted as a deadline for agency action. *See* Def.'s Br. at 13, 33-35. However, it ultimately spurns this reading, which Moffitt rejects as well. *See id.* at 13; Pl.'s Reply at 9; Def.'s Reply at 5. And for good reason: Congress knows how to write rulemaking deadlines, and nothing in the text of Section 3138 even remotely resembles one. The effective date in Section 3138 contrasts with a deadline Congress included in an otherwise similar provision that required HHS to make an adjustment for rural hospitals "by January 1, 2006." 42 U.S.C. § 1395*l*(t)(13)(B). Moffitt's brief catalogues an even greater variety of language in the ACA regarding deadlines, effective dates, and the interrelationship between them, demonstrating that Congress was more than capable of expressing itself clearly on these topics. *See* Pl.'s Br. at

18-22.[4]  But because the statute does not contain a deadline for agency action, the only "silence" in this case is one that HHS has manufactured to justify its deviation from Congress's command. Indeed, a statute is not "'silent' in the *Chevron* sense" if the "most traditional tool" of statutory construction—reading the text —"clearly requires a particular outcome." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088 (D.C. Cir. 1996).  In this case, reading the text does.

Put differently, a statute is not "silent" simply because it fails to separately address every conceivable set of circumstances to which it might apply.  As Judge Henderson has explained: "'Thou shall not kill' is a mandate neither silent nor ambiguous about whether murder is permissible if committed after 5.00 p.m.—or, for that matter, if committed in the billiard room with the candlestick . . . ." *AFL-CIO v. FEC*, 333 F.3d 168, 181 (D.C. Cir. 2003) (Henderson, J., concurring in the judgment).  Similarly, if Congress tells an agency "Do *X*," and the agency does not, it is no defense to say that Congress really meant "Do *X*, but only if *Y*"—where *Y* appears nowhere in the statute.  Otherwise agencies would have unlimited discretion to avoid their statutory duties whenever they felt circumstances warranted it.  In this case, HHS hangs its hat on the fact that Congress did not expressly address what should happen if HHS failed to make an adjustment by January 1, 2011.  But that does not mean Congress remained silent or was ambiguous as to the effective date of the adjustment.  Congress plainly imposed an effective date of January 1, 2011, without any qualification with respect to the timing of HHS's action.  That resolves this case, notwithstanding HHS's delay.

---

[4] There may also be another reason that HHS avoids committing to this interpretation: a silence resulting from a missed deadline would not work entirely to HHS's benefit, because courts do not afford *Chevron* deference when deciding the consequences of an agency's delay beyond a statutory deadline.  *See Nat'l Petrochem. & Refiners Ass'n v. EPA*, 630 F.3d 145, 155-56 (D.C. Cir. 2010).

HHS offers several additional arguments in support of its interpretation, but none is convincing. In fairness to HHS, it has advanced many of these arguments on the assumption that the statute's supposed "silence" would take it to *Chevron*'s "step two," the reasonableness of its interpretation. *See* Def.'s Br. at 23-28. And at step two, these arguments might well carry the day. But because HHS's case stalls at "step one," its arguments must instead carry the heavy burden of showing that the statute is silent or ambiguous, notwithstanding its plain text. *See Engine Mfrs.*, 88 F.3d at 1088-89. They cannot do so.

### Budget Neutrality

First, HHS appeals to budget neutrality. All adjustments under § (t)(2)(E), including the one required by Section 3138 of the ACA, must be "budget neutral." 42 U.S.C. § 1395*l*(t)(2)(E). As a result, whenever HHS makes upward adjustments to payment rates under § (t)(2)(E), it must make offsetting decreases elsewhere. *See Amgen*, 357 F.3d at 112. For example, in its OPPS rulemaking for the 2012 calendar year, HHS decreased all payments by 0.22% to reflect that the cancer-hospital adjustment would cost approximately $71 million. *See* 76 Fed. Reg. at 74,190. HHS never made a similar offset to accommodate a downward adjustment for the 2011 calendar year. Thus, it argues, interpreting Section 3138 to require a retroactive adjustment would be incompatible with budget neutrality. Def.'s Br. at 23-25.

But HHS has not demonstrated that the budget-neutrality requirement in § (t)(2)(E) gives rise to silence or ambiguity regarding how to apply the effective date Congress mandated here. In the November 2011 rulemaking, HHS noted that, "insofar as the cancer adjustment is budget neutral," the interpretation proffered by the cancer hospitals would require payments for 2011 that had not been offset by contemporaneous reductions. 76 Fed. Reg. at 74,205. HHS did not explain, however, why a January 2011 effective date would *necessarily* run afoul of budget neutrality. As all parties (including the cancer hospitals themselves) emphasized during the

rulemaking process, HHS has "exceedingly broad" equitable authority to fashion adjustments under § (t)(2)(E). JA at 59. While the most logical way to carry out the statute's budget-neutrality mandate is to decrease rates prospectively for the upcoming year, nothing says that is the only way. That seems particularly true here, where HHS has elected to make the cancer-hospital adjustment at cost report settlement well after the services are rendered, not by adjusting prospectively-set rates. *See* 76 Fed. Reg. at 74,204.

In fact, as Moffitt points out, not long ago HHS made a "retroactive payment adjustment" under § (t)(2)(E) for certain services rendered by rural hospitals in 2006. *See* Pl.'s Reply at 13-15 (quoting Medicare Program, 71 Fed. Reg. 67,960, 68,010 (Nov. 24, 2006)). HHS did not suggest any conflict between that retroactive adjustment and budget neutrality. *See* 71 Fed. Reg. at 68,010. And HHS's attempts to distinguish away the 2006 adjustment are unconvincing: it explains that it had made the rural-hospital adjustment prospectively the previous year, and that the retroactive adjustment applied to only a small sub-class of rural hospitals that were mistakenly excluded from the prospective adjustment. *See* Def.'s Reply at 12-14. But if HHS can correct its own administrative error by means of a retroactive adjustment, surely it can comply with a congressionally-mandated effective date by means of a retroactive adjustment. Certainly, HHS has not explained why a retroactive adjustment for rural hospitals was compatible with budget neutrality, while one for cancer hospitals would not be.

### Prospective Nature of OPPS

Similarly, HHS argues that the nature of OPPS as a system of payments based on prospectively-set rates counsels against retroactive application of the adjustment. Def.'s Reply at 8. The Court finds this no more persuasive than HHS's argument about budget neutrality because it does not demonstrate silence or ambiguity that calls into question the effective date set forth in the statute. Prospective rates are the main feature, but not the only feature, of OPPS.

For example, the TOPS payments that the cancer hospitals receive are not set prospectively. *See M.D. Anderson*, 650 F.3d 685, 689 (D.C. Cir. 2011). And neither is the particular adjustment at issue in this case: it is finalized on an aggregate basis at cost report settlement. *See* 76 Fed. Reg. at 74,204. Given that retroactive payments are a well-known component of OPPS, the generally prospective nature of the system provides no reason to doubt that Congress meant what it said in Section 3138: the adjustment must be effective for services furnished in the 2011 calendar year, without qualification about the timing of the adjustment.

For that reason, HHS misses the mark when it refers to the D.C. Circuit's warnings against judicial meddling in Medicare generally—and prospective payment systems in particular—where retroactive payments threaten to wreak "havoc" on HHS's ability to administer the program. *E.g.*, Def.'s Br. at 24-25 (quoting *Amgen*, 357 F.3d at 112). The Court takes these concerns to heart. But in this case it is Congress, not the Court, that is doing the meddling: Congress required HHS to make a specific adjustment with a set effective date, and HHS may fairly be held to that duty. And for the reasons explained above, Moffitt's challenge is fit for judicial review.

Moreover, the fact that this case concerns only a single retroactive adjustment distinguishes it from three prior district-court cases on which HHS relies. *See Sw. Miss. Reg'l Med. Ctr. v. Leavitt*, No. 3:08-cv-263 (DPJ) (JCS), 2009 WL 1011152 (S.D. Miss. Apr. 15, 2009); *Lifestar Ambulance Serv., Inc. v. United States*, 604 F. Supp. 2d 1372 (M.D. Ga. 2009); *Caritas Med. Ctr. v. Johnson*, 603 F. Supp. 2d 81 (D.D.C. 2009). Each of these cases concerned HHS's initial implementation of prospective payment systems Congress mandated for Medicare. OPPS—the prospective payment system for outpatient services that is at issue in this case—is one such system. In each case, Congress required the existing payment system to end, and the

prospective payment system to begin, for services rendered starting on a fixed date. And in each case, HHS failed to promulgate the prospective payment system on time. In that context, it may well have been plausible to conclude that Congress did not intend the new payment systems— which necessarily included prospective components—to apply retroactively *in their entirety*, and as such, it may have been reasonable for HHS to fill the gap between the expiration of the old system and the implementation of the new system. This case, by contrast, concerns a single adjustment that HHS itself has decided to calculate and apply at cost report settlement, not by adjustments to the prospective payment rates. HHS has not shown that such a retroactive adjustment would be incompatible with the generally prospective nature of OPPS, such that it would call into question Congress's clear command.

### Presumption Against Retroactivity

HHS also appeals to the presumption against retroactivity, which provides that "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." *Nat'l Petrochem. & Refiners Ass'n v. EPA*, 630 F.3d 145, 158 (D.C. Cir. 2010) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994)). In particular, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). As an initial matter, the Court is not entirely convinced that the presumption applies. While the presumption is "not strictly confined to cases involving private rights," it "is most helpful in that context." *Republic of Austria v. Altmann*, 541 U.S. 677, 696 (2004). In this case, the primary effect of a retroactive

adjustment would be to require the government to make an additional payment to Moffitt.[5]
Moreover, the "aim of the presumption is to avoid unnecessary *post hoc* changes to legal rules on which parties relied in shaping their primary conduct." *Altmann*, 541 U.S. at 696. Here, the government's own delay is the only reason why it might end up on the hook for retroactive payments—hardly the type of unfairness that the presumption is designed to prevent.

In any event, as its name suggests, the presumption against retroactivity can be overcome, namely when Congress clearly authorizes retroactivity. *See Landgraf*, 511 U.S. at 280; *Bowen*, 488 U.S. at 208.[6] The D.C. Circuit has held that the presumption is generally overcome when the "statute prescribes a deadline by which particular rules must be in effect" and the deadline is missed. *Nat'l Petrochem.*, 630 F.3d at 162 (quoting *Sierra Club v. Whitman*, 285 F.3d 63, 68 (D.C. Cir. 2002) (quoting *Bowen*, 488 U.S. at 224 (Scalia, J., concurring))). Similarly, Section 3138's clear effective date—one unburdened by any deadline for agency action and coming only nine months after the ACA's enactment—suffices to overcome the presumption.

---

[5] The adjustment could theoretically have a retroactive impact on private parties, if the government decided that budget neutrality demanded clawing back funds paid to other hospitals for services rendered during the 2011 calendar year. HHS hints at this possibility, *see* Def.'s Reply at 24 & n.12, but does not suggest it would actually be required to do so under Moffitt's interpretation of the statute. Indeed, HHS has apparently, on a prior occasion, temporarily raised prospective rates in order to make up for "reductions applied in prior years." *Id* at 24 n.13. There seems to be no reason why HHS could not do the converse here if it believed offsets were required: make a slight reduction in prospective rates for a future year to accommodate a retroactive adjustment for Moffitt. Such "secondary" retroactivity—the alteration of *future* obligations based on past transactions—would not trigger the presumption. *See Bowen*, 488 U.S. at 219-20 (Scalia, J., concurring).

[6] The Medicare statute generally provides that Medicare regulations will not apply retroactively before their enactment, "unless the Secretary determines that (i) such retroactive application is necessary to comply with statutory requirements; or (ii) failure to apply the change retroactively would be contrary to the public interest." 42 U.S.C. § 1395hh(e)(1)(A). By its own terms, this provision authorizes HHS to engage in retroactive rulemaking in cases, like this one, where it is required by statute to do so.

HHS cites *Sweet v. Sheahan*, 235 F.3d 80 (2d Cir. 2000), for the principle that the presumption against retroactivity should apply here. Def.'s Br. at 26-27. But *Sweet* is distinguishable. In *Sweet*, Congress had ordered the Secretary of Housing and Urban Development ("HUD") to promulgate regulations requiring certain landlords to disclose lead-based paint, with an effective date in October 1995. *See* 235 F.3d at 84. HUD did not finalize its regulations until early 1996, with an effective date later in 1996. *See id.* at 85. The Second Circuit found that the statute did not clearly authorize retroactive application of the regulations, because the effective date "was necessarily based on the assumption that final regulations would be promulgated by that date." *Id.* at 89. Critically, however, Congress had in fact required HUD to finalize its regulations in 1994. *Id.* at 84. Thus, the "assumption" that the Second Circuit relied on—that the agency would promulgate the regulations in advance of the effective date— was a direct result of the text of the statute. In this case, HHS seeks to advance a similar assumption based on a deadline for agency action that appears nowhere in the statute.[7]

### Absurdity Doctrine

Finally, HHS insinuates that Moffitt's reading might lead to absurd results. *See* Def.'s Reply at 10-11. What if, HHS wonders, it had needed three years to finish its study of the cancer hospitals' costs? In that case, Moffitt's reading would require years of retroactive payments— surely inconsistent, HHS asserts, with the prospective nature of OPPS. *See id.* But "this result would only occur *if [HHS] permitted it to happen*," not because it flows necessarily from Moffitt's reading of the statute. *Depomed, Inc. v. HHS*, 66 F. Supp. 3d 217, 235 (D.D.C. 2014).

---

[7] The Court also notes that *Sweet* appears not to be in accordance with the law of this Circuit. As noted above, the D.C. Circuit has held that the presumption against retroactivity generally *is* overcome when an agency misses a statutory deadline. *See Nat'l Petrochem.*, 630 F.3d at 162-63. *Sweet* appears to hold the opposite. The *Sweet* court also afforded *Chevron* deference to HUD, *see* 235 F.3d at 90-93, but courts in this Circuit do not defer to agencies when deciding the consequences of missing a statutory deadline, *see Nat'l Petrochem.*, 630 F.3d at 155-56.

True, HHS's delay could, if it went on long enough, have led the government to incur retroactive liabilities that would arguably be absurdly large. That provided good reason for HHS not to delay. But it does not provide any reason to disregard Congress's mandatory effective date. And in any event, as the D.C. Circuit has held, the absurdity doctrine justifies deviating from the statutory text only to the extent of the absurdity. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998). The Court cannot find that requiring HHS to make up a single year of missed payments, as is required under the statute here, is absurd.

*  *  *

In sum, HHS's arguments do not give the Court reason to deviate from the basic assumption underlying all statutory interpretation: "the legislature says what it means and means what it says." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 20 (2017) (alterations omitted) (quoting *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017)). Congress required HHS to promulgate a cancer-hospital adjustment for the 2011 calendar year. HHS has not yet done so. Accordingly, the Court will order HHS to comply with that duty.

### C. Remedy

Moffitt requests that the Court, among other things, (a) vacate the provisions of the November 2011 rulemaking that set an effective date of January 1, 2012, for the cancer-hospital adjustment, (b) direct HHS to change the effective date to January 1, 2011, and (c) require HHS to adjust Moffitt's payments for its 2011 and 2012 fiscal years accordingly. Compl. ¶ 41. The Court will deny Moffitt's motion to the extent it seeks any of that specific relief, which is not clearly required by the statute and which, as explained above, would appear to require the Court to go beyond its jurisdiction. Instead, the Court will simply remand to HHS so that it can consider and adopt an "appropriate adjustment" for the 2011 calendar year. The Court expects

HHS to act in a timely manner and invites Moffitt to return for further relief if HHS fails to do so.

## IV.    Conclusion

For all of the above reasons, the Court will grant in part and deny in part Moffitt's motion for summary judgment (ECF No. 13), deny HHS's cross-motion for summary judgment (ECF No. 16), and remand the case to HHS for proceedings consistent with this Opinion, in a separate order.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: July 18, 2018